22 A.3d 210

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Ernest CANNON, Appellee.**

Supreme Court of Pennsylvania.

Argued March 9, 2010.

Decided June 21, 2011.

Hugh J. Burns, Jr., Philadelphia, Priya M. Travassos, Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

David Scott Rudenstein, for Ernest Cannon.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice ORIE MELVIN.

We granted review to consider the propriety of the Superior Court's extension of the *Bruton*[1] rule to a circumstance involving prosecutor commentary. For the reasons that follow, we hold that the prosecutor's remark did not negate the redaction and, therefore, did not trigger the *Bruton* rule. Moreover, any potential for prejudice arising from the prosecutor's comment was cured by the numerous cautionary instructions to

---

1. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that where a non-testifying co-defendant's confession directly and powerfully incriminates the defendant, an instruction to the jury to consider the evidence against only the co-defendant is insufficient to protect the defendant's Sixth Amendment confrontation rights).

the jury. Accordingly, we reverse the grant of a new trial and reinstate the judgment of sentence.

On March 11, 2005, at approximately 3:00 a.m., Philadelphia Police Officer Albert Phipps received a radio call alerting him to an incident in the 2400 block of West Turner Street in the City of Philadelphia. Officer Phipps discovered a black male, later identified as Robert Sample ("the victim"), lying face down on the sidewalk directly in front of the residence at 2401 West Turner Street. The victim died from multiple gunshot wounds to the head and neck. The Crime Scene Unit collected three fired cartridge cases and a bullet fragment. A trail of the victim's personal items led from the body to the steps of 2401 West Turner Street. Notes of Testimony (N.T.) Trial, 1/22/07, at 82–84.

Homicide Detective James Burns canvassed the area for witnesses. At approximately 4:00 a.m., he knocked on the door of 2401 West Turner Street but received no answer. Detective Burns returned with his partner, Detective Harkins, around 7:00 a.m. and once again knocked on the door. The residents of the third-floor apartment, Jamilla and Dominique Everett (collectively "the Everetts"), opened the door.[2] The detectives informed the Everetts that they were investigating the homicide and asked whether there were any other individuals in the apartment. Dominique replied that her boyfriend, Khalif Alston ("Alston"), was asleep in her bedroom in the rear of the apartment. Jamilla stated that her children and Ernest Cannon ("Appellee") were asleep in her bedroom. After obtaining permission to enter the apartment, the detectives found Alston and Appellee in the locations identified by the Everetts. The Everetts, Alston, and Appellee denied any knowledge of the homicide but agreed to accompany the detectives to the police station for further questioning. *Id.* at 267–82.

Jamilla gave an initial statement at 9:30 a.m. on the day of the murder. She told detectives that she heard gunshots and went to investigate. Jamilla stated that she then saw Alston,

2. The first and second floors of 2401 West Turner Street were unoccupied.

Appellee, and Dominique smoking marijuana in her room. Jamilla claimed that she did not mention hearing shots because she assumed the noise woke the others. Jamilla told her sister that there was someone lying on the ground outside. Dominique gave two statements to the police on the morning of the murder in which she denied knowledge of the crime. *Id.* at 366–69, 475–87.

Later that afternoon, the Everetts consented to a search of their apartment. The police recovered a .40 caliber semiautomatic handgun from inside the toilet tank. The handgun had one live round in the chamber and seven live rounds in the magazine. Following the search, the police transported the Everetts back to the Homicide Unit for further questioning. *Id.* at 382–84.

Jamilla gave a second statement after the recovery of the handgun. Jamilla indicated that she heard gunshots, after which Alston and Appellee entered the apartment and proceeded into Dominique's room. She heard one of the men say, "You're f[– – –]ing drawn. What the f[– – –] did you do? We gonna both go to jail." The other responded that he had no choice because the victim tried to take the gun. Hearing sirens, Jamilla went to the window and saw the victim's body lying on the ground. Jamilla reviewed, signed, and dated the statement. *Id.* at 386–87.

Dominique gave the police a third sworn statement at 11:45 p.m. on March 11, 2005. She reported that Alston came into her room while Appellee entered Jamilla's room shortly after the shots were fired. According to Dominique, Jamilla joined Appellee at the window, saw the body, and began screaming at Appellee, "What did you do?" Appellee and Alston began to argue, and Alston stated, "You drawn." Appellee responded, "That's my gun. I ain't getting rid of it." *Id.* at 499–500.

When the detectives interviewed Alston, he confessed to his role in the crime. He stated that he went to the Everetts' apartment around 12:30 a.m. He was gambling downstairs with several other males when Appellee arrived. The two men retreated upstairs to the Everetts' apartment, where

Appellee told Alston that he was broke and ready to "jam" someone. Alston suggested that they go to the store and rob whomever they encountered. While returning from the store, they saw the victim, and Appellee said, "Let's get him; I'm ready to fade him." Alston agreed but did not want the victim to see his face. Alston told the detectives that Appellee then confronted the victim with his gun drawn. When the victim grabbed Appellee, he fired one shot. As Alston fled into the house, he heard three more shots and Appellee yelling not to lock the door. Once Appellee entered the apartment, he gave Alston some cash. N.T., 1/25/07, at 432–36.

On March 16, 2005, Dominique gave a fourth statement at the District Attorney's Office. Dominique stated that Alston arrived at her apartment after midnight on the date of the murder. Dominique and Alston smoked marijuana, after which Alston went downstairs to gamble. Dominique fell asleep and awoke to find Alston and Appellee in her room smoking marijuana. When they ran out of drugs, Appellee stated that he had more and asked Alston to walk with him to a store one block away. Ten minutes after Alston and Appellee left, Dominique heard a gunshot. She then heard someone running up the stairs to the apartment, followed by three more gunshots. Dominique stated that she heard Jamilla screaming at Appellee, "What the f[– – –] did you do?" Appellee decided to leave the apartment and picked up a gun that was lying on the kitchen table. Alston told Appellee to hide the gun. Appellee refused and insisted on leaving. After observing police at the scene, Appellee decided to remain overnight. Dominique reviewed, signed, and dated her statement. *Id.* at 326–29.

Following consolidation of their cases, both men were tried by a jury sitting before the Honorable Sheila Woods–Skipper. In his opening statement, the prosecutor recounted the events on the date of the murder. He described the discovery of the victim's body, the recovery of the murder weapon, and the detective's initial encounter with Alston, Appellee, and the Everetts. The prosecutor also related the statements Jamilla

gave to the police, implicating Alston and Appellee in the shooting.

The prosecutor then described the statement that co-defendant Alston gave to the police on the day of the murder. Since Appellee and Alston were being tried together, the statement had been redacted by substituting the phrase "the other guy" for any reference to Appellee.[3] As relevant herein, the prosecutor stated:

> Detectives speak to Mr. Alston. They confront him. We got this gun in here. This is what Jamilla said. What does he say? You're going to hear it. He confesses to his role in the crime. This is a case with a confession. Now, everything I've said up to this point about the evidence against Mr. Alston and [Appellee] is admissible against both of them. Think of it this way: It's like bookends. Everything from one end to the other end comes in in this case. Everything I've said to you up until this point is a bookend that is admissible against Mr. Alston all the way down to [Appellee]. It's admissible against both men. Her Honor is going to explain to you that a statement, a confession by Mr. Alston gives us a slightly different bookend. His statement is admissible only against him. That's the only basis that you can consider against Mr. Alston.

> With that in mind, this is what he says. He talks about being downstairs gambling, going upstairs. "We went upstairs and I tell the other guy, that was drawn, robbing the landlord where my baby lives, the landlord that Mr. Alston was downstairs gambling with. We smoke a little weed and was just talking. The other guy pulled out a couple of bills out of his pocket and was like, damn. I'm f[– – –]ed up, dog; like he was broke. He was like, I'm ready to jam someone. And I was like, well, let's go get a Dutch at the store and if we see somebody, we will do it.

> "So [we] went down to the store on 24th and Oxford and bought two Dutches and headed back to the house. That's when we seen the boy coming up 24th street. The other

---

**3.** We note that Appellee did not lodge a *Bruton*-based objection to the adequacy of the redaction.

guy was like, let's get him. I was like, that boy is dirty. He ain't got no money. The other guy was like, I'm ready to fade him. I was like, okay. But he can't see my face because I got to come back here again. The other guy was going to put him on the ground and I was going to go into his pockets and take whatever he had.

"Next thing I knew, the other guy was on him. He got in front of him and pulled out his gun and then grabbed the boy trying to pull him in. The boy grabbed a hold of the other guy and then the other guy fired. I heard like four shots total. When the boy grabbed the other guy, the other guy pushed him off and fired the first shot. The boy went right down. I started running and I heard three more shots. While I was running to my baby's mom's house, the other guy yelled, don't lock me out. I ran in my baby's mom's house. The other guy came running in right behind me. We went upstairs to the third floor. When the other guy got up there, he was like, boy ain't got s[– – –]. I was like, yeah. Whatever. Then he gave me $20, two $5's and a bunch of $1's. Then we smoke some more and I went to bed with my girl."

Those are his words, Mr. Alston's. That he agreed to participate in that robbery of a man. That he agreed he was going to go through that man's pockets when he was put on the ground. That he was going to take his proceeds, take his property for his own. The man who was chosen was [the victim]. And [the victim] died because of the greed of Mr. Alston. *The evidence will show through other sources, ladies and gentlemen, the person who was with Mr. Alston, was [Appellee].*

How do we know? We know from Dominique. Dominique Everett was interviewed. And when she was interviewed that night, she said, "I hear these two men coming running upstairs. I hear them arguing over what has just taken place outside. I hear them complaining about what has just taken place outside. She's interviewed again a couple days later at the District Attorney's Office and she says, I see in [Appellee's] hands a black semiautomatic handgun. I see

that gun in his hands as [Appellee] is arguing with [Mr. Alston] over the crime that just took place outside and how they are both [in a] hell [of a] lot of trouble. And I hear how [Appellee] wants to get out of there that night, have a friend call to come pick him up so he can escape. But it doesn't work because the police get there too quickly and his friend can't pick him up, so he stays the night.

That's the case. There's more. You will hear more. But that essentially is the case. Evidence that is overwhelming against each man for their roles in choosing to commit a robbery, in choosing a victim for their robbery, in taking property from their victim and in shooting him multiple times in the head and leaving him there to die. . . .

N.T., 1/22/07, at 33–38 (emphasis added).

At the conclusion of the prosecutor's opening, Appellee objected and moved for a mistrial, claiming that the prosecutor "broke the redaction" by identifying Appellee as "the other guy" referenced in Alston's statement. After hearing argument, the trial court denied the motion for a mistrial. At Appellee's request, the court gave the jury an immediate cautionary instruction. The trial judge reminded the jury, consistent with the initial charge, that opening statements do not constitute evidence. The judge further explained that Alston's statement could only be considered against him.

During the Commonwealth's case-in-chief, the prosecution presented testimony from the Everetts. Both disavowed their earlier statements, claiming that they were made following continued harassment from the police. The Commonwealth also introduced testimony about Alston's inculpatory statement. Ballistics evidence established that the handgun found in the Everetts' apartment was the murder weapon.

The jury convicted Appellee of first-degree murder, robbery, conspiracy to commit robbery, and carrying a firearm on the public streets of Philadelphia.[4] The trial court sentenced Appellee to life in prison for the murder conviction. The trial

4. Alston was convicted of second-degree murder, robbery, and conspiracy.

court imposed concurrent sentences of ten to twenty years' imprisonment each for robbery and conspiracy and a concurrent term of three and one-half to seven years' imprisonment for the firearm offense.

On appeal to the Superior Court, Appellee claimed, *inter alia,* that he was entitled to a new trial because of prosecutorial misconduct committed during the opening statement. *Commonwealth v. Cannon,* 974 A.2d 1177, unpublished memorandum (Pa.Super.2009). Appellee argued that he suffered irreparable prejudice when the prosecutor identified him as "the other guy" referenced in Alston's confession. The Superior Court found merit to Appellee's claim, relying upon our theoretical expansion of the *Bruton* rule in *Commonwealth v. Brown,* 592 Pa. 376, 925 A.2d 147 (2007). In *Brown,* we stated that the *Bruton* rule may apply to circumstances where a prosecutor negates the redaction by announcing that "the other guy" referenced in a non-testifying co-defendant's statement is the defendant. The Superior Court found the instant case distinguishable from the facts of *Brown,* but analogous to the hypothetical extension of *Bruton* proposed therein. *Cannon, supra* at 12. The Superior Court reasoned that the *Bruton* rule applied because the prosecutor's comment directly inculpated Appellee beyond the properly introduced evidence. *Id.*

The Superior Court further concluded that the cautionary instruction was insufficient to cure the prejudice caused by the prosecutor's remark. *Id.* at 12. The court opined that the prosecutor's comment, which occurred before the presentation of evidence, made it nearly impossible for the jury to disregard the remark and attribute the incriminating facts of Alston's statement solely to him. *Id.* Accordingly, the court vacated the judgment of sentence and remanded for a new trial.

The Commonwealth petitioned this Court for allowance of appeal, which we granted limited to the following issue:

Did the Superior Court override controlling authority establishing that in a joint trial, where the Commonwealth prop-

erly redacted a co-defendant's statement and did not use it to directly establish [Appellee]'s guilt, and where the trial court properly instructed the jury regarding that statement, the narrow exception to the presumption that a jury will follow its instructions established in *Bruton v. United States*, 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476] (1968), does not apply?

The Commonwealth argues that the Superior Court erred in finding that the prosecutor's opening statement violated Appellee's rights under the Confrontation Clause.[5] It claims that the court ignored the presumption that a jury will follow instructions, opting to apply the narrow exception established in *Bruton*. The Commonwealth contends that the Superior Court erred in its application of the law because the *per se Bruton* rule is strictly limited to situations where the prosecution uses the un-redacted, facially incriminating statement of a non-testifying co-defendant to establish a defendant's guilt at a joint trial. The Commonwealth observes that the prejudice *Bruton* aims to eliminate can be avoided by redacting the non-testifying co-defendant's statement and providing a limiting instruction. *See Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (holding that the Confrontation Clause is not violated by the admission of a non-testifying co-defendant's confession where the statement is redacted to eliminate any reference to the defendant and is accompanied by a limiting instruction). The Commonwealth contends that the *Bruton* rule does not encompass statements that are incriminatory by inference or when linked with other evidence introduced at trial. *Richardson*, 481 U.S. at 208, 107 S.Ct. 1702; *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998).

The Commonwealth maintains that it properly redacted Alston's statement, thereby complying with the requirements of *Bruton* and its progeny. Furthermore, it notes that the trial court immediately gave a cautionary instruction, curing any possible harm caused by the prosecutor's statement. The

---

**5.** "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him." U.S. Const. amend. VI.

Commonwealth avers that this was merely a case of "contextual implication," which falls outside the scope of *Bruton*.[6]  *See Richardson, supra* at 208–09, 107 S.Ct. 1702.

According to the Commonwealth, the Superior Court impermissibly extended the scope of *Bruton* based on a misinterpretation of our pronouncement in *Brown*.  The Commonwealth maintains that the situation envisioned in *Brown, i.e.,* where a prosecutor negates the redaction, did not occur in the case *sub judice*.  In support of this argument, the Commonwealth contends the prosecutor's statement properly indicated that evidence from "other sources" would prove that Appellee conspired with Alston.  It observes that the "objectionable statement" was preceded and followed by direct references to the other evidence establishing Appellee's guilt, namely the Everetts' statements.  Thus, it is the Commonwealth's position that Alston's statement was never used against Appellee.  The Commonwealth asserts that Appellee's argument to the contrary is untenable because the prosecutor expressly stated that Alston's confession could not be considered in assessing Appellee's guilt.  Accordingly, the Commonwealth maintains that there was no *Bruton* violation, and any possible harm caused by the prosecutor's remark was cured by the cautionary instruction and general charge to the jury.

Appellee counters that the prosecutor's comment implicated *Bruton*.  Relying on the Superior Court's analysis, Appellee claims that the prosecutor negated the redaction by reading Alston's inculpatory statement and then unequivocally identifying Appellee as the "the other guy."[7]  Accordingly, Appellee claims that the instant case presents the type of scenario that we cautioned against in *Brown*.

Appellee further contends that the prosecutor's reference to "other sources" as the basis for identifying Appellee is disin-

6.  In this vein, the Commonwealth notes that the law does not prohibit a prosecutor from drawing attention to the inference that the jury can permissibly make.

7.  In lieu of presenting independent argument and analysis, Appellee excerpted several pages from the Superior Court's opinion directly into his brief.

genuous. Appellee maintains that the prosecutor's remark did not focus on other evidence establishing that he was the gunman. Rather, Appellee argues that the focus was on Alston identifying him as the shooter. In this regard, Appellee observes that aside from Alston's statement, the evidence against him was purely circumstantial. Thus, he posits that the prosecutor's reference to "other sources" was a misrepresentation that fails to insulate the instant case from a *Bruton* violation.

In the case *sub judice*, we must assess the applicability of the *Bruton* rule to a situation involving prosecutor commentary. Accordingly, we are presented with a question of law for which our scope of review is plenary, and our standard of review is *de novo*. *Brown, supra* at 154–55.

The Confrontation Clause guarantees a criminal defendant the right to cross-examine witnesses. *Richardson,* 481 U.S. at 206, 107 S.Ct. 1702. Ordinarily, a witness whose testimony is introduced at a joint trial is not considered a witness "against" a defendant if the jury is instructed to consider the testimony only against a co-defendant. *Id.* This principle is in accord with the well-established presumption that jurors will abide by their instructions. *Id.; Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352, 361 (1995). In *Bruton,* however, the United States Supreme Court recognized that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton,* 391 U.S. at 135, 88 S.Ct. 1620. Accordingly, "[t]he *Bruton* Court held that, if a non-testifying co-defendant's confession directly and powerfully implicates the defendant in the crime, then an instruction to the jury to consider the evidence only against the co-defendant is insufficient, essentially as a matter of law, to protect the defendant's confrontation rights." *Brown,* 925 A.2d at 157 (citing *Bruton,* 391 U.S. at 135–36, 88 S.Ct. 1620).

The United States Supreme Court examined the *per se* *Bruton* rule in *Richardson, supra,* and emphasized its narrow scope. Therein, the Court held that the "Confrontation Clause is not violated by the admission of a non-testifying co-defendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson,* 481 U.S. at 211, 107 S.Ct. 1702. Consistent with the High Court's pronouncement and our own line of cases, we have held that substituting the neutral phrase "the guy" or "the other guy" for the defendant's name is an appropriate redaction. *See Commonwealth v. Travers,* 564 Pa. 362, 768 A.2d 845, 851 (2001).

In *Brown,* this Court considered a scenario outside the traditional *Bruton* paradigm. The objectionable event in *Brown* was a non-evidentiary comment by counsel. During closing argument, the prosecutor referred to the defendant by his alias while discussing a non-testifying co-defendant's redacted confession. Recognizing that the United States Supreme Court has not extended the reach of *Bruton* to comments by counsel, this Court observed that there might be an instance where remarks during an opening or closing statement could be so prejudicial that a finding of error would be unavoidable. *Brown,* 925 A.2d at 159. We explained:

> There is no point in redacting and sanitizing otherwise inculpatory statements of a non-testifying co-defendant, to facilitate a joint trial, if that protective measure approved by the High Court to comport with the Confrontation Clause could be deliberately and directly undone by lawyer commentary. Consider, for example, if the redacted evidence would be powerfully incriminating if tied to the defendant, and the prosecutor were to say something along the lines of: "You heard the co-defendant's confession, which also described the actions of someone he identified only as 'the other guy;' well, I'm here to tell you that 'the other guy' he was speaking of was the defendant and we just changed the wording of the statement." ... We have no doubt that, in an appropriate case, the High Court would approve applica-

tion of the *per se Bruton* rule to an instance where the objection is to argument by counsel concerning *Bruton*-redacted evidence.

*Id.* at 159–60. While not condoning the prosecutor's misstatement, we concluded that the circumstances were not so egregious as to implicate *Bruton*.[8] Finally, we observed that the trial court's response to the objection, which consisted of a "direct, unequivocal, and strong" cautionary instruction, was sufficient to cure any prejudice. *Brown,* 925 A.2d at 161. The Court recognized that the trial court is in the "best position" to assess whether the misstatement is curable, thereby acknowledging the deference that must be accorded to the trial court's ruling. *Id.* at 160–61.

■■ Thus, pursuant to *Brown,* a *Bruton* violation may arise when a prosecutor discloses to the jury that the co-defendant's statement has been redacted and unequivocally identifies the defendant as the individual whose name was removed. Contrary to Appellee's argument and the Superior Court's finding, the case *sub judice* does not implicate the *Bruton* rule. Simply stated, the facts of the hypothetical *Bruton* violation posited in *Brown* are distinguishable from the facts of the instant case. As such, the Superior Court's extension of the *Bruton* rule based on *Brown* was unwarranted.

Initially, we observe that when making the "objectionable" comment, the prosecutor did not use the precise language of the redaction. After reading Alston's redacted confession to the jury, the prosecutor stated, "The evidence will show through other sources, ladies and gentleman, the person who was with Mr. Alston was [Appellee]." Thus, the prosecutor referenced "the person who was with" Alston, not "the other guy." While a seemingly trivial difference, the lack of symmetry in the language attenuates the link between the comment

8. In reaching this conclusion, we noted that the prosecutor's comment only affected the redaction indirectly and by inference. *Brown,* 925 A.2d at 160. Additionally, the revelation of the defendant's alias concerned a point in time after the crime and, therefore, did not directly implicate him in the murder beyond the properly introduced evidence. *Id.*

and the redacted statement. It further distinguishes the instant case from *Brown,* where our hypothetical had the prosecutor mimicking the exact language of the redaction.[9]

Moreover, the prosecutor did not directly inculpate Appellee with Alston's statement. Significantly, the prosecutor stated that evidence from "other sources" would indicate that Appellee was the man who conspired with Alston. The prosecutor unequivocally told the jury that the confession could be used only against Alston, presented the evidence against Alston, and then transitioned to the admissible evidence against Appellee. Thus, the identification of Appellee was inculpatory by reference to evidence other than the redacted confession. Linking Appellee to the crime with other properly admitted evidence is not a violation of the *Bruton* rule; it is a permissible instance of contextual implication *Richardson, supra* at 208–09, 107 S.Ct. 1702 (recognizing the distinction between codefendant confessions that expressly incriminate and those that become incriminating when linked with properly introduced evidence). Since the prosecutor did not use Alston's statement to establish Appellee's guilt, he did not negate the redaction.

We emphasize the significance of the fact that the prosecutor, consistent with his proffer, identified the evidence from "other sources" that established Appellee's guilt.[10] Immediately after making the comment, the prosecutor queried, "How do we know? We know from Dominique." N.T., 1/22/07, at 37. The prosecutor proceeded to explain that Dominique's statement placed Appellee at the scene and linked him to the

**9.** In *Brown* we stated, "You heard the co-defendant's confession, which also described the actions of someone he identified only as *'the other guy;* ' well, I'm here to tell you that *'the other guy* ' he was speaking of was the defendant and we just changed the wording of the statement." *Id.* at 159–60 (Emphasis added).

**10.** The Superior Court stressed the importance of the timing of the prosecutor's comment. The Superior Court reasoned that by making the comment before the presentation of evidence, the prosecutor improperly influenced the jury's ability to evaluate the evidence against Appellee without regard to Alston's statement. Since we find no *Bruton* violation, we do not address the allegation that the timing of the remark clouded the jury's ability to properly weigh the evidence.

gun, which ballistics evidence identified as the murder weapon. Furthermore, Dominique indicated that she overheard Appellee and Alston quarrelling about the shooting, a fact corroborated by Jamilla's statement. The prosecution presented the aforementioned evidence at trial, ultimately proving that Appellee was the shooter. Notably, the Superior Court recognized this fact, twice acknowledging that the evidence—absent the redacted confession—was sufficient to sustain the verdict. *Cannon, supra* at 3–4, 12.

The Superior Court failed to appreciate the distinction between the prosecutor's comments in this case and the hypothetical posed in *Brown*. In our example in *Brown,* the prosecutor blatantly disclosed to the jury that the statement had been redacted and that the individual whose name had been removed was the defendant. By contrast, the prosecutor in the instant case referenced the other evidence detailing Appellee's involvement in the crime. His comment merely introduced the admissible evidence that the prosecution would present during its case-in-chief. Thus, the prosecutor's remark was not the type of direct inculpation that *Brown* held could constitute a *Bruton* violation.

Additionally, the record reveals that the jury received numerous cautionary and explanatory instructions that were sufficient to cure any prejudice. At Appellee's request, the trial court issued a cautionary instruction following the prosecutor's comment. The court stated:

> Jurors, just to be clear, I want to make sure you understand that, one, any reference by the Commonwealth to a statement by Mr. Alston, that statement can only be used against Mr. Alston and not anyone else. So that statement can only be used against Mr. Alston. I want to make sure that you are clear on that. And obviously as I indicated in my preliminary instructions to you, the arguments and the opening statements of counsel are not evidence. The evidence will come from the witness stand once the witnesses are placed under oath and that is the evidence that you can consider. This is what the Commonwealth hopes to prove

in the course of this trial. But it is not evidence. No evidence has been received in this case.

N.T., 1/22/07, at 49–50. In its final charge to the jury, the trial court stated:

A statement made before a trial may be considered as evidence only against a defendant who made the statement ... You must not, however, consider the statement as evidence against anyone else. You may not use the statement in any way against anyone else. So to be clear, if you find that the statement was voluntary, you can only use it as evidence against Mr. Alston and no one else.

*Id.* at 766. The jury was further cautioned, "The speeches of counsel are not part of the evidence and you should not consider them as such." *Id.* at 768.

Thus, our review of the record indicates that the trial court gave "direct, unequivocal, and strong" cautionary instructions, repeatedly detailing the proper manner of weighing the evidence. *Brown, supra* at 161. The trial court, which is in the best position to assess whether any prejudice can be cured, determined that the prosecutor's comment did not justify a mistrial. *Id.* In reaching a contrary result, the Superior Court failed to accord proper deference to the trial court, thereby disregarding our pronouncement in *Brown.*

Accordingly, we conclude that the redaction combined with the trial court's accurate and repeated cautionary instructions sufficed to protect Appellee's Sixth Amendment confrontation rights. As such, we find no merit to the allegation that the prosecutor violated *Bruton* by identifying Appellee as "the other guy" referenced in Alston's redacted confession. Stated differently, the prosecutor's comment did not corrupt or negate the otherwise proper redaction. The Superior Court's conclusion to the contrary was premised on a misreading of *Brown.* While we do not disavow our statement in *Brown,* we recognize that the facts upon which we proposed an expansion of the *Bruton* rule are distinguishable from the facts of the present case. Thus, we find that the prosecutor's comment

was not so egregious as to trigger the *Bruton* rule as envisioned in *Brown.*

The order of the Superior Court is reversed and the judgment of sentence is reinstated.

Chief Justice CASTILLE, Justices EAKIN, TODD and McCAFFERY join the opinion.

Justice SAYLOR files a concurring opinion in which Justices BAER and TODD join.

Justice SAYLOR, concurring.

I join the majority opinion subject to the following observations.

The narrow issue on which allocatur was granted pertains to whether the prosecutorial remarks at issue fall within the *per se* prejudice rule of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *See Commonwealth v. Cannon,* 603 Pa. 137, 137, 982 A.2d 1218, 1218–19 (2009) (*per curiam*). I agree with the majority that they do not. *See* Majority Opinion, at 208–09, 22 A.3d at 218–19. Nevertheless, I wish to clarify that the complained-of comments were indeed objectionable under the United States Supreme Court's Sixth Amendment jurisprudence. Furthermore, prosecuting attorneys should, in my view, be admonished to avoid the tactic used by the district attorney here-that is, making comments to a jury concerning the guilt of one defendant that are couched, directly or through paraphrasing, in terms of the non-testifying co-defendant's out-of-court statement(s). My reasoning follows.

The Confrontation Clause guarantees a criminal defendant the right to cross-examine witnesses against him. *See* U.S. CONST. amend. VI; *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 1706–07, 95 L.Ed.2d 176 (1987). As the majority points out, a witness whose testimony is introduced at a joint trial is not considered to be "against" a defendant if the court instructs the jury that the testimony may only be used to assess the guilt of the other defendant. *See* Majority Opinion, at 505–06, 22 A.3d at 217–18; *accord Cruz v. New*

*York,* 481 U.S. 186, 190, 107 S.Ct. 1714, 1717, 95 L.Ed.2d 162 (1987). The Supreme Court has explained, however, that this limitation on the scope of the Confrontation Clause rests, to some degree, upon a legal fiction that the judicial system finds necessary as a practical matter to facilitate joint trials. *See Richardson,* 481 U.S. at 211, 107 S.Ct. at 1709 ("The rule that juries are presumed to follow [such] instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.").[1]

In this respect, it is worth noting that Confrontation–Clause difficulties inevitably arise when a non-testifying co-defendant's pre-trial statement inculpating other persons is placed before the jury during a joint trial. This is because such statements tend to be self-serving, *see Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986) (recognizing that a co-defendant's confession is "presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another"), and, moreover, even where the statement is redacted a jury may suspect that the defendant sitting at counsel table is one of the other, unnamed persons whose actions are described in the statement. *See Gray v. Maryland,* 523 U.S. 185, 193, 118 S.Ct.

---

1. I refer to it as a limitation because, but for the fact of the joint trial, the jury deciding the first defendant's fate would not hear the testimony in question. Presently, for example, if Appellee had been given a separate trial, Alston's statement to the police would have been inadmissible. *See Crawford v. Washington,* 541 U.S. 36, 68–69, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004); *accord Davis v. Washington,* 547 U.S. 813, 826, 126 S.Ct. 2266, 2276, 165 L.Ed.2d 224 (2006) (reciting that police interrogations directed at gathering evidence about, or identifying the perpetrator of, a past crime fall within the class of testimonial hearsay against which the Confrontation Clause was designed to protect); *Michigan v. Bryant,* — U.S. ——, ——, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011) ("[T]he most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial.").

1151, 1155, 140 L.Ed.2d 294 (1998). Indeed, *Richardson* teaches that appropriate redactions do not entirely eliminate such difficulties, but merely assist the jurors in obeying the court's directive to disregard the statement relative to the defendant who is deprived of the opportunity to cross-examine the declarant. The Court elaborated as follows:

> In *Bruton*, the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial. . . .

> Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; *whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget.*

*Richardson*, 481 U.S. at 208, 107 S.Ct. at 1707–08 (emphasis added; citations and footnote omitted).

The above passage illustrates that, notwithstanding the admissibility of an adequately redacted statement issued by a non-testifying co-defendant, the Supreme Court views the Confrontation Clause as protecting the accused from *any* prosecutorial use of that statement against him; otherwise, there would be little point in focusing on whether properly-instructed jurors could "thrust out of mind" or "forget" any inferential incrimination that ensued. *Cf. Lilly v. Virginia*, 527 U.S. 116, 128, 119 S.Ct. 1887, 1896, 144 L.Ed.2d 117 (1999) (citing *Gray* for the position that, because the use of an

accomplice's confession "creates a special, and vital, need for cross-examination," a prosecutor desiring to offer such evidence must comply with *Bruton,* hold separate trials, use separate juries, or abandon the use of the confession). Therefore, although the Court has shown a willingness to tolerate the potential for contextual implication by the jury based on evidence alone (and only so long as the jury is properly cautioned), it has not approved attempts by prosecuting authorities to suggest those inferences expressly. As *Richardson* shows, the Supreme Court would view such prosecutorial actions as injurious to the Constitution.

By comparison, the district attorney's conduct in the present case made it more difficult for the jury to avoid considering Alston's statement against Appellee. It thus undermined the foundation supporting the admissibility of redacted statements, and ran counter to the purpose of the Sixth Amendment's protections as characterized by the Supreme Court in terms of protecting the defendant from spillover prejudice at joint trials. Accordingly, to the extent the majority can be understood to endorse the exploitation of "contextual implication" in conjunction with a non-testifying co-defendant's statement, *see* Majority Opinion, at 609, 22 A.3d at 219 (referring to "a permissible instance of contextual implication"), I respectfully disagree with such endorsement.

Notwithstanding the above, I ultimately join the majority's disposition of the present appeal based upon the limited nature of the question accepted for review. Because the Commonwealth did not alert the jury that the statement had been altered, it did not "break" the redactions, thus placing this matter outside of *Bruton's* precepts concerning irreparable harm.

Justices BAER and TODD join this Concurring Opinion.